IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| In the Matter of the Dependency of M.-A.F.-S., dob 4/13/2011, and V.F.-C., dob 11/21/2007, | ) ) ) ) | No. 76170-6-I (Consolidated with No. 76171-4-I) DIVISION ONE |
| Minor children. | ) ) | |
| STEPHANIE FRANKS, | ) ) | |
| Appellant, | ) ) | ORDER DENYING MOTION FOR RECONSIDERATION |
| v. | ) ) | AND REQUEST TO STAY AND WITHDRAWING AND |
| STATE OF WASHINGTON, DEPARTMENT OF SOCIAL AND HEALTH SERVICES, | ) ) ) ) | SUBSTITUTING OPINION |
| Respondent. | ) ) | |

Appellant Stephanie Franks filed a motion for reconsideration of the opinion filed on April 30, 2018 and a request to stay. The State of Washington Department of Social and Health Services filed a response to the motion for reconsideration and request to stay. The panel has determined that the motion should be denied, but the opinion filed on April 30, 2018 shall be withdrawn and a substitute opinion filed to amend footnote 1 on page 1 as follows:

> The briefs change the caption in this case to use the mother's initials. "The title of a case in the appellate court is the same as in the trial court." RAP 3.4; see also Hundtofte v. Encarnación, 181 Wn.2d 1, 330 P.3d 168 (2014). The case caption in superior court in a dependency or termination proceeding identifies the children by name. In an appeal from a dependency or termination proceeding, by statute, the case caption uses initials only for the children identified in the trial court caption. See RCW 13.50.100

(confidentiality of juvenile care agency records); see also Gen.
Order 2017-1 of Divisions I, II, & III, In re Changes to Case Title
(Wash. Ct. App.), http://www.courts.wa.gov/appellate_trial_courts/
?fa=atc.genorders_orddisp&ordnumber=I-021&div=I (citing RCW
13.50.100).

Now, therefore, it is hereby

ORDERED that appellant's motion for reconsideration and request to stay
is denied and the opinion filed on April 30, 2018 shall be withdrawn and a
substitute opinion amending footnote 1 on page 1 shall be filed.

2



# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Dependency of M.-A.F.-S., dob 4/13/2011, and V.F.-C., dob 11/21/2007,<br><br>Minor children.<br><br>STEPHANIE FRANKS,[†]<br><br>Appellant,<br><br>v.<br><br>STATE OF WASHINGTON, DEPARTMENT OF SOCIAL AND HEALTH SERVICES,<br><br>Respondent. | No. 76170-6-I<br>(Consolidated with No. 76171-4-I)<br><br>DIVISION ONE<br><br><br><br>PUBLISHED OPINION<br><br><br><br>FILED: July 2, 2018 |

SCHINDLER, J. — Stephanie Franks is the mother of M.-A.F.-S. and V.F.-C. After a lengthy dependency to allow Franks to address her severe drug addiction, the court terminated her parental rights to the two children. Franks contends the termination statutes, RCW 13.34.180 and .190, are unconstitutional both facially and as applied.

---

[†] The briefs change the caption in this case to use the mother's initials. "The title of a case in the appellate court is the same as in the trial court." RAP 3.4; see also Hundtofte v. Encarnación, 181 Wn.2d 1, 330 P.3d 168 (2014). The case caption in superior court in a dependency or termination proceeding identifies the children by name. In an appeal from a dependency or termination proceeding, by statute, the case caption uses initials only for the children identified in the trial court caption. See RCW 13.50.100 (confidentiality of juvenile care agency records); see also Gen. Order 2017-1 of Divisions I, II, & III, In re Changes to Case Title (Wash. Ct. App.), http://www.courts.wa.gov/appellate_trial_courts/?fa=atc. genorders_orddisp&ordnumber=I-021&div=I (citing RCW 13.50.100).

Franks also contends the Washington State Department of Social and Health Services (Department) did not prove all statutory elements or that termination was in the best interests of the children. We hold neither the statutory scheme nor case law support the constitutional challenge to the termination statutes. Substantial evidence supports the extensive findings of fact and the conclusion that the Department proved by clear, cogent, and convincing evidence that it offered or provided all necessary and available services capable of correcting parental deficiencies; that Franks had notice of parental deficiencies and the grounds for termination; that Franks was currently unfit to parent her children; and that termination is in the best interests of the children. We affirm the order terminating Franks' parental rights to M.-A.F.-S. and V.F.-C.[1]

## FACTS

Stephanie Franks is the mother of four children, A.L.-C., date of birth July 22, 2003; V.F.-C., date of birth November 21, 2007; M.-A.F.-S., date of birth April 13, 2011; and I.T.-V., date of birth November 12, 2012.

Franks has a long history of severe methamphetamine and marijuana addiction. Franks tested positive for marijuana at the birth of V.F.-C. in November 2007 and at the birth of M.-A.F.-S. in April 2011. Franks admitted using methamphetamine and marijuana while pregnant with M.-A.F.-S. From June 2011 through November 2012, Franks agreed to participate in services. Franks obtained a substance abuse evaluation at New Traditions. The Department also referred Franks for a neuropsychological

---

[1] The court terminated by default the parental rights of the father of M.-A.F.-S. and the father of V.F.-C. Neither father appeals.

evaluation and mental health counseling services. Franks did not follow through with substance abuse treatment and declined to engage in mental health services.

I.T.-V. was born on November 12, 2012. Franks and I.T.-V. tested positive for amphetamines. Franks admitted using methamphetamine during the pregnancy. The Department removed the four children from her care and filed a dependency petition. At the shelter care hearing, the Department placed I.T.-V. with his father. The Department later dismissed the dependency as to I.T.-V.

On January 11, 2013, Franks entered an agreed dependency order for A.L.-C., V.F.-C., and M.-A.F.-S. Franks stipulated to the facts establishing dependency, including her long and severe history of substance abuse, drug use during pregnancy, and not following through with substance abuse treatment, mental health services, or counseling. Franks stipulated there was "no parent, guardian or custodian capable of adequately caring for the children, such that the children are in circumstances which constitute a danger of substantial damage to the children's psychological or physical development."[2] The court found by clear, cogent, and convincing evidence that "a manifest danger exists that the children will suffer serious abuse or neglect if the children are not removed from the home."

The court entered a disposition order. The order requires Franks to follow the November 2012 New Traditions substance abuse evaluation treatment recommendations, obtain random urinalyses (UAs) with clear results for 90 days, obtain a parenting assessment, follow treatment recommendations, and participate in mental health counseling. Franks expressly acknowledged she understood the terms of the

---

[2] See RCW 13.34.030(6)(c).

order, including "my responsibility to participate in remedial services," and entry of the dependency order "starts a process that could result in the filing of a petition to terminate my relationship with my children if I fail to comply with the terms of this order and/or I fail to substantially remedy the problems that caused the children's out-of-home placement."

The Department placed the three children with a maternal cousin. The court authorized supervised visitation for Franks and the children two times a week. Department social worker Sarah Bergner provided referrals to Franks for court-ordered services, including a mental health evaluation and parenting assessment.

In July 2013, Franks absconded with the children. Approximately a month later, the Department placed the children in licensed foster care.

The court order following the February 2014 dependency review hearing states the primary permanency plan is return of the children to Franks and adoption. In an April 10, 2014 letter to Franks, Bergner reiterated the court-ordered requirements and asked Franks to contact her.

> I have attempted to call you multiple times without success. **Please, provide me with your current contact information.** It is my hope that together we can ensure the on-going safety of your children.[3]

After failing to complete an outpatient substance abuse program, Franks enrolled in an inpatient treatment program at Seattle Drug & Narcotic Center (Seadrunar) in July 2014. Seadrunar terminated Franks from the program for rule violations. Franks admitted she relapsed. Franks testified that at the time, she was "using" drugs about "75 percent of the time." The court changed the primary permanency plan to adoption.

---

[3] Emphasis in original.

In December 2014, the Department filed a petition to terminate Franks' parental rights to A.L.-C., V.F.-C., and M.-A.F.-S. The petition alleged that beginning with voluntary services in 2011, the Department offered referrals and services to address her substance abuse but Franks repeatedly failed to enter and complete substance abuse treatment and had been terminated from Seadrunar. The petition alleged Franks "has declined to participate in mental health counseling or a parenting assessment, stating that she wants to obtain sobriety before participating in these services." The petition alleged there was "little likelihood" conditions would be remedied in the near future.

> The mother has a long history of substance abuse. The Department has provided her with numerous referrals and voluntary services to address her needs. Since dependency was established, she has not complied with court ordered services or maintained consistent contact with the Department.
>
> . . . .
>
> The mother has also not engaged in mental health counseling or a parenting assessment. The mother told the Department she wants to obtain sobriety before participating in these services.
>
> . . . .
>
> The mother has had regular visitation with the children, however the number of weekly visits have reduced at the mother's requests, because she reports the visits are too upsetting to the children. The caretaker who supervises the visits reports that the children cry and act out during the visits, that the mother is unable to control the children, and that the children display behavioral issues following the visits.

In April 2015, Franks reentered inpatient treatment at Seadrunar. Franks told the court that she wanted to continue substance abuse treatment and planned to participate in the other court-ordered services. Beginning in May 2015, the court entered a series of agreed orders to continue the termination trial to allow Franks to participate in services.

Department social worker Larry Nelson was assigned to work with Franks and the children in July 2015. Franks was living at Seadrunar. Franks was doing well. She

spent time with the children on a regular basis. In September 2015, Franks left Seadrunar. Franks did not complete the Seadrunar program. Instead, Franks enrolled in an intensive outpatient treatment program at New Traditions. New Traditions diagnosed Franks with a severe amphetamine and cannabis use disorder.

Franks participated in a psychosocial and parenting evaluation with Dr. Carmela Washington-Harvey in November and December 2015. Dr. Washington-Harvey did not identify any clinical problems, parenting behaviors, attitudes, personality traits, or psychological factors that would adversely affect Franks' ability to parent. After observing a visit with the children, Dr. Washington-Harvey believed the interactions were appropriate and Franks demonstrated a parental bond. Dr. Washington-Harvey emphasized that remaining sober is a critical factor in Franks' ability to parent the children. Dr. Washington-Harvey recommended Franks participate in parenting services, including parenting classes and coaching.

In February 2016, Franks successfully completed the initial phase of the outpatient treatment program at New Traditions. In March 2016, the court authorized overnight visits with the children. Around this time, Franks started missing outpatient treatment sessions at New Traditions. In April, Nelson made arrangements for Franks to engage in family preservation services with mental health counselor Carmela Maxell.

Maxell had difficulty contacting Franks but eventually met with her four times. Franks told Maxell that she planned to obtain mental health counseling and had made an appointment with Cowlitz Tribal Health Services. Maxell "really tried to press" and motivate Franks to follow through with mental health treatment and maintain contact with the children.

By May, Franks had stopped attending treatment sessions at New Traditions. At about the same time, Franks started missing scheduled visits with the children. Nelson repeatedly told Franks that missing the visits upset the children and urged Franks to reengage in chemical dependency treatment and obtain mental health treatment.

On June 17, 2016, Nelson met with Franks at her home. Franks admitted she "had relapsed." Nelson asked Franks if she would agree to get a UA, follow through with treatment at New Traditions, and engage in mental health treatment at Cowlitz Tribal Health. Franks agreed. That same day, Nelson drove Franks to New Traditions for a UA then to Cowlitz Tribal Health for a chemical dependency evaluation and a mental health intake assessment.

On June 21, the court granted the motion of the guardian ad litem (GAL) to suspend overnight visits and allow only supervised visits with the children. The court ordered Franks to participate in additional services, including a UA within 24 hours, a hair follicle test for substance use, and 90 days of random UAs with no positive results. Franks knew about but did not attend the June 21 hearing. Despite repeated attempts to contact Franks, Franks had no further contact with the Department or the children.

The two-week termination trial began on September 20, 2016. The Department called a number of witnesses and the court admitted over 70 exhibits.

Department supervisor Cynthia Blair testified about referrals to Franks for court-ordered services. Blair said that although Franks was "in and out of contact" at the beginning of the dependency, the social workers "were good about trying to connect with" her. Blair testified that social worker Bergner talked to Franks about "mental health options" and the social workers tried to initiate a parenting assessment. But

Franks "was very clear to us that she wasn't prepared to do these additional services until she got clean. So, she did repeat to us that she wanted to try to get sober first, and then do her other services."

Beginning in January 2015, Navos Mental Health Solutions child therapist Marie Sohl met with M.-A.F.-S. on a weekly basis. Sohl testified, "[T]he ideal is to work with the child and the parent." Sohl met with Franks on October 27, 2015. Sohl repeatedly reminded Franks about the importance of participating in the weekly sessions with M.-A.F.-S. Franks agreed to participate in therapy sessions with M.-A.F.-S. Sohl expected Franks to attend the weekly therapy sessions and sent Franks a reminder each week.

Franks attended four sessions in November 2015, two sessions in January 2016, and two sessions in May 2016. Sohl told Franks that when she did not come to the sessions, M.-A.F.-S. "thinks that he did something wrong." But Franks would not commit to "make it more often." Sohl testified the intermittent contact was "damaging" to M.-A.F.-S. and interfering with "bonding with another family." Sohl testified, "The most important thing for [M.-A.F.-S.] is predictability, consistency, especially since he's a child affected by trauma and disrupted relationships. And so, he—he needs that more than anything."

> The intermittent contact is damaging to [M.-A.F.-S.] because the basis of a child's relationship with their mother is a basic trust that the child—the mother will be there; that when he needs something, that she will respond. And it's one of the very first milestones in emotional theory that says that a child's first year or so of life is trying to establish that others are trustworthy; that . . . there is stability and consistency of care. If a child receives consistent, predictable care, then they can develop a trust in themselves. This trust they will be able to take with them. And this trust they—in other relationships so that he would be—feel secure in that he's loved even when he's feeling threatened. So, it's a very core milestone that this child does not seem to have established at this point, which should be established in the first—first 18 months of his life.

The foster parents for V.F.-C. and M.-A.F.-S. told Nelson that Franks "missing more and more visits" was "really upsetting" the children.

> Mom often would let [the children] know specific things: we're going to go to the zoo, or we're going to have a barbecue with certain relatives, and things like that. And then, when the foster parent—generally it was the foster parent—showed up to drop the kids off when [Franks] didn't answer the door, didn't answer texts, the kids were extremely upset, crying. I heard [V.F.-C.] apparently cried after that, and the foster parent noted that [V.F.-C.] is not a kid that cries, that she had had her quite a while, and hadn't seen her cry. But this was upsetting because on a Friday evening Mom made a bunch of plans with her, and the next day was not available.

Nelson told Franks about the harm she caused by missing the scheduled visits with the children and the need to follow through on the court-ordered services.

> I let [Franks] know, and I said that it's really important that you follow the court services; and not doing the services, that it's not in the best interest of this situation. But, especially putting the kids through this is extremely difficult.

Nelson testified that after Franks left Seadrunar, A.L.-C. "made the decision for quite a few months not to visit his mother." A.L.-C. told Nelson, "I kept believing in [Franks], but then she lied. And, she kept saying she was sober; then she wasn't. Or she'd get us back, and then she wasn't." A.L.-C. said he was "just tired of all that" and "stayed feeling that way for quite a few months."

V.F.-C. told GAL Elizabeth Berris she "was worried about her mom because she was sick and sleepy a lot." V.F.-C. also told Berris that while spending time with Franks, V.F.-C. drank beer.

> [V.F.-C.] told me that she—that [V.F.-C.], herself, drank beer when she was at a visit; that her mom was in the bathroom for long periods of time smoking with her friends while she was watching TV, and that's when she would drink beer; that her mom then found out and told her not to drink beer, but that she did it on another time.

When Franks was in treatment in early 2016, V.F.-C. told the GAL that her mother said V.F.-C. would return home by May. But after Franks "cut off contact with any of her kids" in June, V.F.-C. "didn't want to visit with her mom."

> [V.F.-C.] said she wasn't ready to visit with her mom. She didn't—she didn't want to visit with her mom, she wasn't ready to see her mom, but someday she wanted to go home with her mom and her brothers. She also said that she loved living with . . . her current foster placement.

Berris testified that M.-A.F.-S. was doing well. M.-A.F.-S. had started kindergarten and continued to engage in mental health therapy with Sohl. Berris said M.-A.F.-S. loves his mother but does not want to discuss visitation with her.

Berris testified about the effect the missed visits had on V.F.-C. and M.-A.F.-S. For example, over the 2016 Memorial Day weekend, Franks arranged to pick up V.F.-C. from her foster home but then did not show up. That same weekend when the foster parent tried to drop off M.-A.F.-S., Franks would not open the door and M.-A.F.-S. "freaked out." Two days later, Franks did not pick up M.-A.F.-S. as planned. Franks called the foster parent that afternoon. Franks said she "was sleeping and had to go do laundry." Berris also described "Mother's Day weekend" as "another weekend where Mother had basically disappeared for the weekend." Both V.F.-C. and M.-A.F.-S. expected Franks to pick them up. When Franks did not, "both kids were devastated."

Berris testified Franks' parental deficiency is substance abuse.

> Mom is 30 years old. She started using at—using methamphetamines at 19 years old. So, she's used most of her adult life. And she has been through many treatment attempts and has not been successful. She graduated IOP,[4] but then quickly fell off when she was in outpatient. She's never completed an inpatient treatment.

---

[4] Intensive outpatient treatment.

Berris recommended termination of parental rights to V.F.-C. and M.-A.F.-S.

These children have been in out-of-home care for almost four years. [M.-A.F.-S.] came into care at 19 months, and he's five and a half now. He's grown up without his mom being there. [V.F.-C.] came in at five; she's almost nine now. Mother has demonstrated that she's not been able to put a handle on her addiction. And when she relapsed, she relapsed hard. As Mr. Nelson said, she didn't relapse and was open and honest and, okay, I'm gathering my supports, let's address this addiction. . . . [S]he continued to use, continued to hide it, and—and dropped out of everything.

She was giving—given all the—the services and the skills to remedy these issues, and she hasn't been able to do that. And her children need an opportunity to move forward and to land in a permanent home. This emotional tug where they—I mean, they love their mom. But this emotional tug where they might see their mom and—and want to go home to their mom, but then their mom doesn't show up for visits, it's—it's too hard for the children, and they need to be able to not wait for their mom anymore. They've been waiting for her for almost four years. She's been using since she was 19 and she's 30, and she—her recent testimony is she's been using all summer.

Berris described the harm to the children caused by continuation of the parent-

child relationship with Franks.

I think there would be great harm. The children would continue to be in this limbo state, not know—not be able to form healthy attachments with future care providers. As [the foster mother] testified, there was a bond because [V.F.-C.] was always looking towards her mom, looking towards going to her mom's home. And if the Court continues this case or denies the termination, the children's focus are always going to be on Mom and that emotional attachment. And Mom—and the disruption because Mom hasn't been there for them because Mom lets them down. They don't trust their mom to—to be there for them. And so, they're going to be greatly harmed long-term if the Court doesn't grant the petition.

Dr. Washington-Harvey testified that because Franks "had a history of relapse

and struggling with that," maintaining sobriety was a critical factor in her ability to parent

the children. In her report, Dr. Washington-Harvey concluded the prognosis for

reunification " 'is fair to moderate with the possibility of being upgraded to good if

[Franks] is able to demonstrate a commitment to change and show proof that she can

apply what she has learned from services in the parenting of children.' " Based on

Franks' relapse in May or June 2016 and her failure to participate in services or visit the

children in the months before trial, Dr. Washington-Harvey testified that the prognosis

for Franks' current ability to reunify with the children was "poor to fair." When asked

why she "previously . . . said fair to moderate, but now you're dropping it down . . . from

poor to fair," Dr. Washington-Harvey testified:

> I think that sobriety is very important in order to be able to parent properly. And, the children I would be concerned about because of what I saw in the records, and also the mother, the fact that the—the mother is not there for those children, and she needs to be there. She needs to work on being a good parent. And, whatever her reasons are for relapse, I don't know what they are, but I do know that it would have a huge impact on her children and on her ability to parent. And, I would question serious—or seriously her true commitment to change. And, also, I would want to know what happened to her, because people do relapse, and it is part of recovery, they say.
> But, these children have been without their parents for quite some time, and they deserve to have stability.

A department manager for permanency planning and adoption, Laurie

Washington, testified that filing a termination petition is a critical step to recruit

prospective adoptive families. Washington said fewer than 25 percent of prospective

families consider adopting children if a termination petition has not yet been filed

because the "legal risk or emotional risk" is too high. By contrast, if the court terminates

parental rights, the pool of placement options increases significantly. Washington

testified that "at least one, if not more, families are coming to specifically meet [M.-A.F.-

S.]" at an upcoming event. Both the current and former foster parents for V.F.-C.

testified they would consider becoming a permanent placement for her but only if

parental rights had been terminated.

Franks did not attend the termination trial until the third day. Franks testified. Franks admitted she relapsed and had been using methamphetamine almost every day since she last visited her children in June 2016. Franks said she stopped visiting the children because "I didn't want to see them while I was using, while I was still in denial and while I was still hurting that I had relapsed."

Franks testified that she agreed to the dependency "[b]ecause of my—my addiction." Franks admitted that nine days earlier, she refused to participate in inpatient treatment because she did not want "to return back into the same phase that I've done twice." In describing the difference between inpatient and outpatient treatment programs, Franks testified that in an outpatient program, "you could fake what you were doing" outside of the sessions "and say that you were doing what you were supposed to be doing."

Franks insisted her drug addiction did not ultimately affect her ability to care for the children.

> It—it did and it didn't. I mean, how is it not going to affect your children when you're using? But, it's basically that I neglected with my presence—basically by my using. My presence was—was always there, though. I mean, it didn't stop me from cooking their meals. It didn't stop me from waking up at five in the morning and getting one by one ready for daycare and for—for school, and then having to deal with a newborn at the same time. And it never stopped me, though, from washing clothes or making sure that everything that they needed; the lights were on and the house was warm, and they had a bed to sleep in; they had food in the fridge. But, me present—my presence was neglecting them by using.

Franks acknowledged Nelson repeatedly tried to contact her and left her messages but she did not respond. Franks admitted the court ordered her to engage in mental health counseling and she told Nelson that she did not want to participate in mental health counseling. Franks testified that she received helpful counseling during

substance abuse treatment about the issues leading to her addiction and she did not

need mental health counseling when she was sober.

Franks said she agreed to go to Navos in October 2014. But Franks did not want

to participate in mental health counseling because she "didn't want to bring up all that

bad stuff." Franks insisted that when she was sober, she did not need mental health

counseling.

> I did enough what I needed to do. I don't really think mental health
> was stopping them from coming home, because it wasn't
> something that—that was needed for me to mother my children. . . .
>
> . . . .
>
> Q    Do you think . . . you need to do mental health services to have the
> children placed back with you?
> A    In my state of mind that I'm in now, I could say yes. But when I'm
> in the clear mind and I'm sober, I don't think that I need mental
> health counseling at all. When I get into my addicted mind, my
> mind's not clear. My mind's not worrying about nothing [sic] but my
> kids and myself and my health. And, uh, with them I'm not able to
> do that.[5]

At the conclusion of trial, Franks argued the State did not prove by clear, cogent,

and convincing evidence the statutory elements for termination or that termination is in

the best interests of the children. Franks also argued the termination statutes are

unconstitutional. Franks asserted the statutes are not narrowly tailored to achieve the

compelling interest in preventing harm to children. Franks claimed the statutes create

the "possibility" of a "gap" between termination when the child becomes "legally free"

and adoption.

---

[5] Fourth alteration in original.

The court rejected the constitutional challenge to the termination statutes. The court entered extensive findings of fact and conclusions of law terminating parental rights to V.F.-C. and M.-A.F.-S. and continued the proceedings for A.L.-C.

The court identified drug addiction as the parental deficiency. The court found Franks failed to substantially address her drug addiction, "is now in a worse state than when the dependency order was entered," and stopped visiting the children.

> The mother has failed to substantially improve her parental deficiencies in the 46 months following the entry of the disposition order. Ms. Franks has been unable to control her drug addiction. Although there was a period in which she was making significant progress towards reunification, she relapsed in the Spring of 2016 and is now in a worse state than when the dependency order was entered. She has been regularly using methamphetamine, stopped participating in any services, and most importantly she stopped visiting her children despite being repeatedly informed of the negative emotional effect it was having on them. She only attended part of the termination trial, and did not participate in services or visits during the trial.

The court found little likelihood that Franks would "remedy her parental deficiencies within the near future":

> On 3/16/15 the mother requested a continuance of the termination trial for more time to participate in services, on the basis that she was going to change her behavior and was motivated to reunify with the children. She was initially successful in doing so, but then fell off track and relapsed in April of 2016, despite extensive recent treatment and despite knowing that the relapse could have a significant negative impact in the pending termination cases. Since that time she has not been participating in services or visiting the children, even after being advised that irregular visitation has been emotionally harmful to the children. The mother's lack of consistent progress over the length of the dependency, and her inability to maintain the progress that she was making after the termination petition was filed, show that the mother is not in a position to remedy her parental deficiencies within the near future.

The court found the testimony established continuation of the parent-child relationship was harmful to V.F.-C. and M.-A.F.-S.:

> The testimony also supports a conclusion that continuing the parent-child relationship creates feelings of instability and uncertainty, an "emotional limbo", rendering the children less able to form bonds with caregivers, thus creating a barrier to integration into a stable permanent home. So long as the mother's parental rights remain intact, no alternate placement can assure these children as they grow that they are securely in a "forever home." Each of the children have demonstrated negative emotional effects from the mother's intermittent contact. [A.L.-C.] has expressed dismay over the fact that his mother "chooses drugs over him," and has in anger over her failed treatment . . . refused to have visits with his mother for months at a time. [V.F.-C.] has stated that she "doesn't deserve to go home" and that "I want my mom to become a cop so she can shoot me." [M.-A.F.-S.] has told his mother "you must hate me because you don't visit," and has stated "my mom doesn't need me because she has baby [I.T.-V.]," and "nobody loves me," and (to a teacher) "I'm not in your class because you hate me." The mother's lack of contact with her children has caused them to internalize the harmful emotional message that they are not worth being loved.

The court found termination of Franks' parental rights was in the best interests of M.-A.F.-S. and V.F.-C.:

> The children have the right to be raised in a permanent, stable home environment under the care and custody of emotionally stable, nurturing parents where the children will be provided with adequate food, clothing, shelter, medical care, education, emotional support, and a secure place in the community, all of which have not and will not be provided by the mother. Therefore termination of the mother's parental rights is in the best interest of the children [M.-A.F.-S.] and [V.F.-C.].

The court concluded the Department met its burden of establishing "by clear, cogent and convincing evidence" the statutory elements for termination and termination was in the best interests of V.F.-C. and M.-A.F.-S. However, because the evidence showed the situation for A.L.-C. "is particularly fluid" and "could change significantly within the near future," the court concluded it was not in his best interest to terminate parental rights. Instead, the court continued the trial for three months.

ANALYSIS

Constitutional Challenge

Franks contends the Washington termination statutes are unconstitutional both facially and as applied. We granted amici curiae's request to file a brief supporting the constitutional challenge.[6]

Franks and amici assert RCW 13.34.180 and .190 violate substantive due process and interfere with the fundamental rights of parents to the care and custody of their children because the statutes are not narrowly tailored to achieve permanency. Franks and amici argue that permitting the State to terminate parental rights without an imminent adoptive placement is not the least restrictive means of preventing harm to children and may result in continuing harm from "foster care drift." Neither the statutory scheme of the Juvenile Court Act in Cases Relating to Dependency of a Child and the Termination of a Parent and Child Relationship, chapter 13.34 RCW, nor case law support the constitutional challenge to the termination statutes.

We review constitutional challenges de novo. In re Welfare of A.W., 182 Wn.2d 689, 701, 344 P.3d 1186 (2015). Statutes are presumed constitutional. A.W., 182 Wn.2d at 701. "[T]he challenger of a statute must prove beyond a reasonable doubt that the statute is unconstitutional." A.W., 182 Wn.2d at 701. To satisfy this standard, the challenger must "convince the court that there is no reasonable doubt that the statute violates the constitution." A.W., 182 Wn.2d at 701.

---

[6] Amici are law school professors, the Children and Youth Advocacy Clinic at the University of Washington School of Law, and the New York University School of Law Family Defense Clinic.

Parents have a fundamental liberty and privacy interest in the care and custody of their children. Santosky v. Kramer, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982) (plurality opinion) ("[F]reedom of personal choice in matters of family life is a fundamental liberty interest protected by the Fourteenth Amendment" to the United States Constitution.); In re Dependency of J.B.S., 123 Wn.2d 1, 12, 863 P.2d 1344 (1993) ("This court has repeatedly emphasized that parents have a fundamental liberty and privacy interest in the care and custody of their children."). But a parent's constitutional right to the care and custody of a child is not absolute. It is well established the State has a "parens patriae" and an " 'urgent interest' " in the welfare of the child. Santosky, 455 U.S. at 766-67[7] (quoting Lassiter v. Dep't of Soc. Servs., 452 U.S. 18, 27, 101 S. Ct. 2153, 68 L. Ed. 2d 640 (1981)). "[W]hen parental actions or decisions seriously conflict with the physical or mental health of the child, the State has a parens patriae right and responsibility to intervene to protect the child." In re Welfare of Sumey, 94 Wn.2d 757, 762, 621 P.2d 108 (1980). Accordingly, our legislature states that "[w]hen the rights of basic nurture, physical and mental health, and safety of the child and the legal rights of the parents are in conflict, the rights and safety of the child should prevail." RCW 13.34.020. Because parents have a fundamental liberty interest in the care and custody of their children, we examine the termination statutes under the strict scrutiny standard. In re Custody of Smith, 137 Wn.2d 1, 15, 969 P.2d 21 (1998), aff'd sub nom. Troxel v. Granville, 530 U.S. 57, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000); In re Welfare of C.B., 134 Wn. App. 336, 342, 139 P.3d 1119 (2006); In re Parentage of C.A.M.A., 154 Wn.2d 52, 57, 60-61, 109 P.3d 405 (2005).

---

[7] Italics omitted.

Before terminating parental rights, the State must prove the following six statutory elements of RCW 13.34.180(1) by clear, cogent, and convincing evidence:

 (a) That the child has been found to be a dependent child;

 (b) That the court has entered a dispositional order pursuant to RCW 13.34.130;

 (c) That the child has been removed or will, at the time of the hearing, have been removed from the custody of the parent for a period of at least six months pursuant to a finding of dependency;

 (d) That the services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided;

 (e) That there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future. A parent's failure to substantially improve parental deficiencies within twelve months following entry of the dispositional order shall give rise to a rebuttable presumption that there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future. The presumption shall not arise unless the petitioner makes a showing that all necessary services reasonably capable of correcting the parental deficiencies within the foreseeable future have been clearly offered or provided. In determining whether the conditions will be remedied the court may consider, but is not limited to, the following factors:

 (i) Use of intoxicating or controlled substances so as to render the parent incapable of providing proper care for the child for extended periods of time or for periods of time that present a risk of imminent harm to the child, and documented unwillingness of the parent to receive and complete treatment or documented multiple failed treatment attempts;

 . . . ; or

 (iii) Failure of the parent to have contact with the child for an extended period of time after the filing of the dependency petition if the parent was provided an opportunity to have a relationship with the child by the department or the court and received documented notice of the potential consequences of this failure, except that the actual inability of a parent to have visitation with the child including, but not limited to, mitigating circumstances such as a parent's current or prior incarceration or service in the military does not in and of itself constitute failure to have contact with the child; and

(f) That continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home.

RCW 13.34.190(1)(a)(i); see also In re Welfare of A.B., 168 Wn.2d 908, 911, 232 P.3d 1104 (2010).

In addition to proving the six statutory elements by clear, cogent, and convincing evidence, due process requires the court to "make a finding of current unfitness before parental rights can be terminated." In re Parental Rights to K.M.M., 186 Wn.2d 466, 479, 379 P.3d 75 (2016) (citing In re Dependency of K.R., 128 Wn.2d 129, 142, 904 P.2d 1132 (1995); Santosky, 455 U.S. at 747-48). "Satisfying all six of the statutory elements raises an implied finding of parental unfitness." K.M.M., 186 Wn.2d at 479 (citing In re Dependency of K.N.J., 171 Wn.2d 568, 577, 257 P.3d 522 (2011)).

If the court determines the State has met its burden under RCW 13.34.180, the court must determine by a preponderance of the evidence whether termination is in the best interests of the child. RCW 13.34.190(1)(b); A.B., 168 Wn.2d at 911.

RCW 13.34.180 and .190 "are facially constitutional if they advance a compelling state interest and are narrowly drawn to meet that interest." C.B., 134 Wn. App. at 342; C.A.M.A., 154 Wn.2d at 57; Smith, 137 Wn.2d at 15. A statute is narrowly tailored "if it targets and eliminates no more than the exact source of the 'evil' it seeks to remedy." Frisby v. Schultz, 487 U.S. 474, 485, 108 S. Ct. 2495, 101 L. Ed. 2d 420 (1988) (quoting Members of City Council v. Taxpayers for Vincent, 466 U.S. 789, 808-10, 104 S. Ct. 2118, 80 L. Ed. 2d 772 (1984)).

All three divisions of this court have rejected similar constitutional challenges arguing the termination statutes RCW 13.34.180 and .190 are not narrowly tailored to

20

achieve the compelling interest in protecting children from harm. See In re Dependency of I.J.S., 128 Wn. App. 108, 118, 114 P.3d 1215 (2005); C.B., 134 Wn. App. at 344-45; In re Welfare of M.R.H., 145 Wn. App. 10, 30-31, 188 P.3d 510 (2008).

For instance, in C.B., 134 Wn. App. 336, the parent asserted the termination statutes are facially unconstitutional because the statutes allow termination without a determination of harm to the child and without consideration of less-restrictive alternatives. In rejecting the constitutional challenge, the court concluded the mandatory statutory elements of RCW 13.34.180(1) focus on the prevention of harm or the risk of harm to the child. C.B., 134 Wn. App. at 344-45. The court also concluded the statutes provide "the opportunity to each parent to pursue a less restrictive alternative that the State must first encourage and offer before it seeks to terminate parental rights." C.B., 134 Wn. App. at 345-46. The court held the State "necessarily demonstrates that termination of parental rights is required to prevent harm or risk of harm to the child when [the State] shows that all six [statutory] factors [in RCW 13.34.180(1)(a)-(f)] are satisfied." C.B., 134 Wn. App. at 344. Because the termination statutes require the State to prove "in every instance" that termination of parental rights is necessary to prevent harm or the risk of harm to children, RCW 13.34.180 and .190 "survive strict scrutiny and are constitutional." C.B., 134 Wn. App. at 346; see also I.J.S., 128 Wn. App. at 118 ("[T]he termination statutes are narrowly drawn because the State must prove that the relationship with the parents harms or potentially harms the child before the court can terminate parental rights."); In re Dependency of T.C.C.B., 138 Wn. App. 791, 799-800, 158 P.3d 1251 (2007) (rejecting argument that termination statutes are not narrowly tailored because they do not require consideration of a

dependency guardianship or an open adoption); In re Welfare of L.N.B.-L., 157 Wn. App. 215, 256-57, 237 P.3d 944 (2010) (rejecting argument that termination statutes violate substantive due process because they do not require court to reject all less restrictive alternatives, including continued dependency, dependency guardianship, third party custody, or open adoptions, before terminating parental rights); M.R.H., 145 Wn. App. at 30-31 (rejecting argument that the termination statutes are unconstitutional because a court can terminate parental rights without a finding of harm or proof that a less restrictive alternative such as guardianship or open adoption would be harmful).

Nonetheless, Franks and amici claim the statutes are unconstitutional in allowing termination "where no adoptive home exists" and assert the "only compelling state interest served by full termination is achieving permanency for the child through adoption to prevent the specific harm of ongoing instability." Franks argues that because the State need not prove permanent placement for the child is imminent, the termination statutes are not the least restrictive means of preventing the harm of instability to the child. Franks and amici assert terminating parental rights is not necessary unless and until "adoption is imminent." These arguments ignore the fundamental holding of our prior decisions that RCW 13.34.180 and .190 do not violate due process under a strict scrutiny analysis because the court "in every instance" must find by clear, cogent, and convincing evidence that termination is necessary to prevent harm or the risk of harm to children. C.B., 134 Wn. App. at 346.

The termination statutes are narrowly tailored to ensure not only that the requisite harm to the child is not merely an abstract concept but also that continuation of the parental relationship is a barrier to permanency. RCW 13.34.180(1)(f) requires the

Department to prove that continuation of the parent and child relationship "clearly diminishes the child's prospects for early integration into a stable and permanent home." RCW 13.34.180(1)(f) "is mainly concerned with the continued effect of the legal relationship between parent and child, as an obstacle to adoption; it is especially a concern where children have potential adoption resources." In re Dependency of A.C., 123 Wn. App. 244, 250, 98 P.3d 89 (2004).[8] To meet its burden of proving RCW 13.34.180(1)(f), the Department can establish either (1) "prospects for a permanent home exist but the parent-child relationship prevents the child from obtaining that placement" or (2) "the parent-child relationship has a damaging and destabilizing effect on the child that would negatively impact the child's integration into any permanent and stable placement." In re Welfare of R.H., 176 Wn. App. 419, 428, 309 P.3d 620 (2013). Therefore, when the Department proves RCW 13.34.180(1)(f) by clear, cogent, and convincing evidence, it establishes that continuation of the parental relationship will prevent or interfere with a permanent and stable placement, including adoption. Cf. In re Dependency of K.S.C., 137 Wn.2d 918, 930, 976 P.2d 113 (1999) (Proof of RCW 13.34.180(1)(f) "establishes that continuation of the parent-child relationship will harm the child, and in such circumstances a guardianship . . . would not be an appropriate alternative to termination.").

Other provisions of chapter 13.34 RCW emphasize not only the child's right to permanency but also the need for speedy resolution of the dependency proceedings.[9]

---

[8] Emphasis in original.

[9] Washington has adopted a number of provisions of the federal Adoption and Safe Families Act of 1997, designed to speed up the process of permanency planning for children in foster care. See Pub. L. No. 105-89, 111 Stat. 2115.

23

The statutory scheme focuses on the right of a parent to the care and custody of a child and reunification of the family unless the child's right to "nurture, health, or safety is jeopardized." RCW 13.34.020. As previously noted, the expressly stated purpose of chapter 13.34 RCW is to keep the family "intact unless a child's right to conditions of basic nurture, health, or safety is jeopardized":

> When the rights of basic nurture, physical and mental health, and safety of the child and the legal rights of the parents are in conflict, the rights and safety of the child should prevail. In making reasonable efforts under this chapter, the child's health and safety shall be the paramount concern. The right of a child to basic nurturing includes the right to a safe, stable, and permanent home and a speedy resolution of any proceeding under this chapter.

RCW 13.34.020.

RCW 13.34.145(1)(b) mandates a permanency planning hearing "no later than twelve months . . . following the date of removal" and that "[e]very effort . . . be made to provide stability in long-term placement" unless it is in the best interests of the child to return home.

RCW 13.34.145(1)(c) emphasizes the need to achieve permanency as early as possible:

> Permanency planning goals should be achieved at the earliest possible date, preferably before the child has been in out-of-home care for fifteen months. In cases where parental rights have been terminated, the child is legally free for adoption, and adoption has been identified as the primary permanency planning goal, it shall be a goal to complete the adoption within six months following entry of the termination order.

Where, as here, the primary permanency plan is adoption, RCW 13.34.210 states that upon entry of the order terminating parental rights, "the court shall commit the child to the custody of the department . . . for the purpose of placing the child for adoption."

24

Termination of parental rights is necessarily a highly fact-specific proceeding. K.M.M., 186 Wn.2d at 477. Contrary to the argument of Franks and amici, the absence of an immediate permanent placement does not undermine the compelling interest of the State to prevent harm to the child from continuation of the parental relationship.

Franks concedes adoption means termination of all parental rights. See RCW 26.33.260(1).[10] Franks also acknowledges that many adoptive families and agencies "are unwilling to consider adoption until the child is legally free." But Franks maintains the court can address these concerns during an ongoing dependency rather than by terminating all parental rights. Franks analogizes parental rights to property rights. Franks claims to withstand strict scrutiny, the termination statutes should restrict only parental rights that cause harm to the child.

> Parental rights and duties are, like property rights, akin to a bundle of sticks. . . . To be narrowly tailored, a restriction on parental rights must restrict only those aspects of parental rights and duties that are necessary to prevent harm to the child.[11]

Franks asserts the State could alleviate the perceived risks for prospective adoptive families by terminating "only the parent's right to object to a subsequent adoption." In

---

[10] RCW 26.33.260 provides, in pertinent part:

(1) The entry of a decree of adoption divests any parent . . . of all legal rights and obligations in respect to the adoptee, except past-due child support obligations. The adoptee shall be free from all legal obligations of obedience and maintenance in respect to the parent. The adoptee shall be, to all intents and purposes, and for all legal incidents, the child, legal heir, and lawful issue of the adoptive parent, entitled to all rights and privileges, including the right of inheritance and the right to take under testamentary disposition, and subject to all the obligations of a natural child of the adoptive parent.
. . . .
(4) It is the intent of the legislature that this section provide finality for adoptive placements and stable homes for children.

[11] "Property is often analogized to a bundle of sticks representing the right to use, possess, exclude, alienate, etc." Kiely v. Graves, 173 Wn.2d 926, 936, 271 P.3d 226 (2012); see also Lowe v. Rowe, 173 Wn. App. 253, 264, 294 P.3d 6 (2012) ("Control over the land is part of the bundle of sticks associated with land ownership and use.").

an attempt to address the child's "need for stability," Franks suggests, "[N]o parental contact would be permitted unless and until the parent had healed her own problems and was ready to provide a permanent and stable home."

We reject these arguments for two reasons. First, when terminating parental rights, the court has necessarily found by clear, cogent, and convincing evidence that continuation of the parental relationship is harmful to the child. At this point, continuation of the dependency rather than termination of parental rights would impede, not facilitate, the goal of permanency by effectively prolonging the "limbo" of foster care. Second, our Supreme Court has repeatedly held that the termination of parental rights under RCW 13.34.180(1) and .190 does not require the existence of an adoptive family or permanent placement for the child.

In In re Esgate, 99 Wn.2d 210, 212, 214, 660 P.2d 758 (1983), the Washington Supreme Court held that long-term foster care for a developmentally disabled child could constitute a "stable and permanent home" where continuation of the parental relationship is harmful. The court upheld the termination of parental rights without regard to adoption:

> [T]his construction of the statute best serves the legislative goal of insuring that the best interests of the child are protected. See generally In re [Welfare of] Aschauer, 93 Wn.2d 689, 611 P.2d 1245 (1980). In the instant case, the State established that continuation of the parent/child relationship often created feelings of insecurity and instability in the child. Under such circumstances, termination was proper regardless of the child's adoptability.

Esgate, 99 Wn.2d at 214.

In In re Dependency of K.D.S., 176 Wn.2d 644, 658, 294 P.3d 695 (2013), the Washington Supreme Court held the State need not prove the prospect of a permanent

26

placement for purposes of establishing continuation of the parental relationship is harmful.

> We have repeatedly stated that RCW 13.34.180(1)(f) focuses on "the parent-child relationship and whether it impedes the child's prospects for integration, not what constitutes a stable and permanent home. The State does not have to prove that a stable and permanent home is available at the time of termination." K.S.C., 137 Wn.2d at 927. The plain language of RCW 13.34.180(1)(f) merely requires the trial court to find that the continued parent-child relationship diminishes the child's prospects of integration into a stable and permanent home.

K.D.S., 176 Wn.2d at 658.[12]

Franks and amici claim that Esgate and K.D.S. are inapposite because those cases address only statutory construction and the court did not consider whether termination is the least restrictive means of preventing harm to the child. But in both Esgate and K.D.S., the Washington Supreme Court affirmed the termination of parental rights because of harm to the child, even though the record showed no prospects for immediate adoption or permanent placement. Although neither Esgate nor K.D.S. involved a constitutional challenge, the Supreme Court's analysis is consistent with our decisions holding that Washington's termination statutes meet strict scrutiny. Because the termination statutes are narrowly drawn to achieve the compelling interest of the State to prevent harm to the children, we reject Franks' constitutional challenge to RCW 13.34.180 and .190.

Franks' conclusory assertion that RCW 13.34.180 and .190 are unconstitutional as applied is equally unpersuasive. Franks argues elimination of the parental bond will be harmful to V.F.-C. and M.-A.F.-S. because adoption is not imminent and termination

---

[12] Emphasis in original.

will eliminate the possibility of reunification. But the record establishes by clear, cogent, and convincing evidence that Franks' ongoing relationship was harmful to V.F.-C. and M.-A.F.-S. The unchallenged findings establish:

> [A]ll three children have prospects for adoption, and . . . as a general matter, more pre-adoptive homes are available to children who are legally free than those who are not. The children cannot be adopted unless parental rights are terminated.

Franks cannot demonstrate that the termination statutes are unconstitutional as applied.[13]

Challenge to Termination Findings of Fact

In reviewing the decision to terminate parental rights, an appellate court determines whether substantial evidence supports the findings of fact by clear, cogent, and convincing evidence. K.M.M., 186 Wn.2d at 477; K.S.C., 137 Wn.2d at 925; Santosky, 455 U.S. at 766. Clear, cogent, and convincing evidence exists when the evidence shows the ultimate fact at issue is highly probable. K.R., 128 Wn.2d at 141. Unchallenged findings of fact are verities on appeal. A.W., 182 Wn.2d at 711. Deference to the trial court is particularly important in proceedings affecting the parent and child relationship because of "the trial judge's advantage in having the witnesses before him or her." A.W., 182 Wn.2d at 711; K.M.M., 186 Wn.2d at 477. "We defer to the trial court's determinations of witness credibility and the persuasiveness of the evidence." K.M.M., 186 Wn.2d at 477.

---

[13] In their brief, amici cite data to support the claim that "many children languish in foster care." We granted the State's motion to supplement the record with more current Washington data from the Department's Children's Administration. We note that none of this data was before the trial court. Because the statistics are not relevant to Franks' constitutional challenge, we do not address the data.

Necessary and Available Services

Franks challenges the finding that the Department proved it offered or provided all reasonably available services capable of correcting her parental deficiencies within the foreseeable future. RCW 13.34.180(1)(d). " 'Necessary services' are not defined in the statute, but the Department is required to specify in a permanency plan 'what services the parents will be offered to enable them to resume custody.' " K.M.M., 186 Wn.2d at 479-80 (quoting RCW 13.34.136(2)(b)(i)). Consistent with RCW 13.34.180(1)(d), "necessary services" are those services " 'needed to address a condition that precludes reunification of the parent and child.' " K.M.M., 186 Wn.2d at 480 (quoting In re Dependency of A.M.M., 182 Wn. App. 776, 793, 332 P.3d 500 (2014)).

The unchallenged findings describe the ongoing efforts of the Department to provide services to Franks, including drug treatment, mental health counseling, and a parenting assessment, and her intermittent and unsuccessful participation in treatment and services.

> 2.14 Since entry of the dependency and dispositional orders on January 11, 2013, the mother has been offered the court-ordered services of substance abuse treatment, urinalysis testing, parenting assessment, recommendations of parenting assessment, and mental health counseling. She has additionally been offered or provided the subsequent court-ordered services of UA testing, hair follicle testing, and assistance in securing housing.
>
> 2.15 The Department social workers assisted Ms. Franks in getting addiction treatment over the course of more than three years. The mother has repeatedly but intermittently engaged in substance abuse treatment throughout the course of the dependency, at Seadrunar (inpatient treatment, which she failed to complete two times) and at New Traditions (outpatient treatment). The mother successfully completed intensive outpatient drug treatment at New

Traditions earlier this year on February 19, 2016. She has engaged in UA testing while in treatment.

2.16 The mother began reducing her participation in substance abuse treatment in March of 2016, and from that point on social worker Larry Nelson repeatedly urged Ms. Franks to re-engage in substance abuse treatment. After confessing her relapse to social worker Larry Nelson on 6/17/16, he drove her to New Traditions where she did a UA which tested positive for Methamphetamine. Mr. Nelson then drove her to Cowlitz where she did an intake for mental health counseling, and made an appointment for CD[14] assessment and treatment. Then on 6/21/16 the court ordered the mother to participate in additional services, including to complete one UA w/ETG[15] (alcohol) testing component within 24 hours, to obtain a hair follicle test for substance use, and to engage in 90 days of random urinalysis testing. . . . The mother ceased contact with the Department following that hearing and has been unavailable for the Department to schedule her for these services, despite Mr. Nelson's attempts to reach her by phone, text, email, and by going to her home. She has not participated in any services between 6/21/16 and the conclusion of this trial.

2.17 The Department has offered the mother mental health counseling. Initially the mother declined to participate in mental health counseling or a parenting assessment, stating that she wanted to obtain sobriety before participating in these services. However the mother informed the Department at a Shared Planning Meeting on 10/15/14 that she would be participating in treatment at NAVOS.

Franks contends the Department unreasonably delayed offering court-ordered mental health counseling and a parenting assessment for more than two years after entry of the dependency order. A "protracted delay" in identifying and offering necessary services where parents have not resisted or refused services may undermine a finding that the Department offered or provided all necessary services under RCW 13.34.180(1)(d). In re Dependency of T.L.G., 126 Wn. App. 181, 198-203, 108 P.3d 156 (2005).

---

[14] Chemical dependency.

[15] Ethyl glucuronide.

Franks claims that if the Department had timely provided a parenting assessment and integrated addiction and mental health services, she would likely have achieved and maintained sobriety, eliminating the need to terminate her parental rights. The record does not support her argument. The record shows the Department did not unreasonably delay services. The Department made a concerted but ultimately unsuccessful effort to persuade Franks to participate in all court-ordered services.

Social workers repeatedly talked to Franks about participating in the court-ordered services. Franks told department social workers that she wanted to wait to participate in mental health counseling and other services until she was sober.

In 2015, Dr. Washington-Harvey conducted a parenting assessment. The report was completed in January 2016. Dr. Washington-Harvey "seriously questioned [Franks'] commitment to change" and emphasized Franks' "sobriety was critical to her ability to parent the children." The unchallenged findings state:

> After Larry Nelson drove the mother to one or two of the appointments, Dr. Washington-Harvey completed the parenting assessment in January of 2016. Testing was in the normal range for indications of DSM-5[16] mental health issues, however the mother showed an "elevated faking good response" on the Child Abuse Potential Inventory, rendering the results invalid. Her scores on the Adult Adolescent Parenting Inventory indicated high risk as to expectations of children and parental empathy towards children's needs: "she would struggle with empathy." Dr. Washington-Harvey seriously questioned the mother's commitment to change. She emphasized that the mother's sobriety was critical to her ability to parent the children. In addition to continuing to maintain her sobriety, Dr. Washington-Harvey recommended that the mother engage in supportive services of intensive parent coaching, education in child development, parenting instruction for clean and sober parents, parenting support group, and Family Preservation Services upon reunification to ensure a safe home environment.

---

[16] AM. PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (5th ed. 2013).

Beginning in July 2015, Nelson repeatedly urged Franks to participate in mental health services at either Navos or Cowlitz Tribal Health. Even though mental health services were available to her upon request, Franks did not obtain mental health services until June 17, 2016, after Franks told Nelson she had relapsed and agreed to participate in services. Nelson drove her to New Traditions for a UA and to Cowlitz Tribal Health for an intake assessment for chemical dependency and mental health counseling. But Franks failed to follow through with treatment.

Substantial evidence supports the court's findings that Franks initially declined to participate in mental health counseling or a parenting assessment until she achieved sobriety and demonstrated an unwillingness or inability to participate in or successfully complete the necessary services. Further, as previously noted, during her testimony at trial, Franks continued to insist that she did not need mental health counseling. The unchallenged findings state:

> [Franks] told Mr. Nelson that she didn't want to do mental health counseling because she "didn't want to bring up bad stuff." At trial she testified that she didn't need mental health counseling in order to parent her children, that she already engaged in her substance abuse treatment where she received very helpful counseling about the root issues leading to her addiction, and that she didn't need mental health counseling when she was sober.

Under the circumstances, including Franks' insistence on completing addiction treatment before engaging in other services, the need to address her addiction, the unsuccessful attempts at treatment and prompt relapse following a successful treatment, and her repeatedly expressed rejection of any need for mental health counseling, the Department did not unreasonably delay offering Franks mental health counseling and a parenting assessment.

Citing <u>In re Welfare of S.J.</u>, 162 Wn. App. 873, 256 P.3d 470 (2011), Franks contends the Department should have offered integrated substance abuse and mental health services. Franks argues the timely provision of treatment for co-occurring disorders or a dual diagnosis treatment would likely have resulted in a successful outcome. We disagree.

Here, unlike in <u>S.J.</u>, the Department did not unreasonably delay offering Franks mental health counseling and a parenting assessment. <u>See</u> <u>S.J.</u>, 162 Wn. App. at 883-84. Nor did the Department adopt a sequential approach to substance abuse and mental health services. <u>See</u> <u>S.J.</u>, 162 Wn. App. at 881-82. Rather, all services were available to Franks, but she initially insisted on successfully completing addiction services before participating in the other court-ordered services. And unlike the mother in <u>S.J.</u>, Franks did not fully engage in services. <u>See</u> <u>S.J.</u>, 162 Wn. App. at 877. Franks' participation in services was at best inconsistent. Although she successfully completed an outpatient substance abuse treatment program, Franks relapsed almost immediately after beginning the follow-up program. A short time later, Franks ceased participation in all services.

Nothing in the record supports Franks' assertion that she would have successfully participated in necessary services if the Department pressed harder. Franks' trial testimony demonstrates she was fully aware of and knew how to obtain the court-ordered services. Beginning in May 2015, the court granted a number of continuances of the termination trial to allow Franks additional time to engage in court-ordered services. But at the termination trial in September 2016, Franks had relapsed and insisted she did not need mental health counseling. The undisputed record shows

that although Franks made some progress temporarily, her drug addiction left her in a worse state at the time of the termination trial than at the time of the dependency order 46 months earlier.

" 'Where the record establishes that the offer of services would be futile, the trial court can make a finding that the Department has offered all reasonable services.' " K.M.M., 186 Wn.2d at 483[17] (quoting In re Welfare of C.S., 168 Wn.2d 51, 56 n.2, 225 P.3d 953 (2010)). The provision of services is futile "where a parent is unwilling or unable to participate in a reasonably available service that has been offered or provided." K.M.M., 186 Wn.2d at 483; M.R.H., 145 Wn. App. at 25; Aschauer, 93 Wn.2d at 699 n.6; see also T.L.G., 126 Wn. App. at 198-203.

Substantial evidence supports the court finding that to the extent the Department did not provide the services recommended by Dr. Washington-Harvey, offering these services would have been futile.

> To the extent that the Department did not offer or provide the mother with any of the services recommended by Dr. Washington-Harvey, the court finds that it would have been futile to have done so, since Ms. Franks was not participating in the services already ordered and made available to her. She did not attend sessions with Marie Sohl even after Ms. Sohl changed the days of the sessions to accommodate the mother's schedule, or when she offered to come to the mother's hotel, or when Larry Nelson offered to drive Ms. Franks to the sessions. Ms. Sohl, Mr. Nelson, and the GAL regularly encouraged Ms. Franks to attend sessions with Marie Sohl and [M.-A.F.-S.]; repeatedly explained to Ms. Franks the importance of her attendance at these session[s] for [M.-A.F.-S.] and the negative impact on [M.-A.F.-S.] when she didn't attend; yet, the mother didn't follow through. At trial the mother testified that she was "too busy" and "focusing on herself."

---

[17] Internal quotation marks omitted.

Substantial evidence establishes the Department proved it offered or provided all reasonably available services capable of correcting parental deficiencies within the foreseeable future under RCW 13.34.180(1)(d).

Notice of Parental Deficiency

Franks contends the Department violated her right to due process by not only failing to offer parenting and mental health services in a timely manner but also not notifying her that lack of parenting skills and failure to participate in services would constitute grounds for terminating her parental rights. A termination order that relies in part on a parental deficiency that is not identified in the dependency or the termination petition violates due process. A.M.M., 182 Wn. App. at 779. Franks does not dispute her severe drug addiction. But Franks claims the court terminated her parental rights in part because of lack of parenting skills and her failure to participate in parenting and mental health services. The record does not support her argument.

The court found the "primary barrier to reunification with her children was her addiction and relapse history." The court found Franks' "longstanding substance abuse has, and continues to, prevent her from prioritizing her children's needs over her addiction." The court findings stress the severity of the problem, her long history of substance abuse, the effect of her addiction on the choices she made regarding participation in her children's lives, the effect of Franks' recent relapse, and Franks' inability to address her drug addiction during the 46 months following the dependency order. The references the court made to parental deficiencies, including the time needed to correct parental deficiencies and the effect parental deficiencies had on the children, are inextricably related to Franks' drug addiction. When viewed in context, the

court's decision to terminate Franks' parental rights rested on her undisputed severe drug addiction and the direct consequences her addiction had on the ability to care for her children, not on specific deficient parenting skills or a failure to participate in unrelated treatment services. The record does not support Franks' claim that the Department violated her due process rights.

<u>Current Parental Unfitness</u>

Franks contends the Department did not prove she is currently unfit and unable to care for her children. To establish current unfitness in a termination proceeding, the Department must prove by clear, cogent, and convincing evidence that the parental deficiencies "prevent the parent from providing the child with 'basic nurture, health, or safety.' " <u>In re Welfare of A.B.</u>, 181 Wn. App. 45, 61, 323 P.3d 1062 (2014) (quoting RCW 13.34.020). Franks argues her drug addiction does not establish she is unable to meet the basic needs of her children.

Franks testified, "[B]ecause you're using . . . , you're not there for your children. I mean—because you're using. So, it's like basically neglect within your addiction." Nonetheless, Franks maintained that even when she was using drugs, she was able to meet the basic needs of her children. However, in attempting to explain how she was a "functioning addict," Franks focused primarily on her own needs—"I was able to function. I was able to sleep, . . . . I can eat. I can drink things." As Dr. Washington-Harvey stressed, Franks' sobriety was a critical factor in her ability to parent her

children. Substantial evidence supports the court's finding that Franks was currently unfit to parent her children.[18]

Best Interests of the Children

Even if the Department proved the elements of RCW 13.34.180(1), Franks contends the Department did not establish termination was in the best interests of the children. Franks argues there was "testimony that harm would also be caused by severing the children's ties to their mother."

Whether termination of parental rights is in the best interests of the child is a fact-specific inquiry. Aschauer, 93 Wn.2d at 695. The court found both V.F.-C. and M.-A.F.-S. love their mother.

The harmful effect of Franks' intermittent contact with V.F.-C. and M.-A.F.-S. was undisputed. Because of her ongoing drug addiction, Franks maintained only intermittent contact with her children during the lengthy dependency, resulting in "the harmful

---

[18] For the first time in her reply brief, Franks argues the Department improperly relied on two hearsay statements to prove it offered all necessary services and she is unable to care for her children. Because Franks did not object to the challenged testimony, we decline to address her argument. See RAP 2.5(a); State v. Florczak, 76 Wn. App. 55, 72, 882 P.2d 199 (1994) (failure to object to admissibility of evidence precludes appellate review); see also Cowiche Canyon Conservancy v. Bosley, 118 Wn.2d 801, 809, 828 P.2d 549 (1992) (appellate court will not consider issues and arguments raised for the first time in a reply brief). Nonetheless, we note there is other evidence that supports the court's findings. See In re Welfare of X.T., 174 Wn. App. 733, 738-39, 300 P.3d 824 (2013) (erroneous admission of hearsay not prejudicial unless, within reasonable probabilities, the outcome of the trial would have been materially affected had the error not occurred).

emotional message" to the children that "they are not worth being loved."[19] Although it would be "difficult" for M.-A.F.-S. to discontinue contact with his mother, therapist Marie Sohl testified that the "most important thing" for M.-A.F.-S. "is predictability, consistency, especially since he's a child affected by trauma and disrupted relationships."

Nelson testified Franks would need at least 6 to 12 months to demonstrate success in a drug treatment program. Nelson did not think M.-A.F.-S. and V.F.-C. "can take any more" of the trauma caused by Franks' intermittent contact.

"Where a parent has been unable to rehabilitate over a lengthy dependency period, a court is 'fully justified' in finding termination in the child's best interests rather than 'leaving [the child] in the limbo of foster care for an indefinite period' " while the parent attempts rehabilitation. In re Dependency of T.R., 108 Wn. App. 149, 167, 29 P.3d 1275 (2001)[20] (quoting In re A.W., 53 Wn. App. 22, 33, 765 P.2d 307 (1988)). If the health and safety of the child conflicts with the rights of the parent, "the rights and safety of the child should prevail." RCW 13.34.020. The record supports the court's determination that termination is in the best interests of M.-A.F.-S. and V.F.-C.

---

[19] The unchallenged findings state:

Each of the children have demonstrated negative emotional effects from the mother's intermittent contact. . . . [V.F.-C.] has stated that she "doesn't deserve to go home" and that "I want my mom to become a cop so she can shoot me." [M.-A.F.-S.] has told his mother "you must hate me because you don't visit," and has stated "my mom doesn't need me because she has baby [I.T.-V.]," and "nobody loves me," and (to a teacher) "I'm not in your class because you hate me." The mother's lack of contact with her children has caused them to internalize the harmful emotional message that they are not worth being loved.

[20] Alteration in original.

In sum, we reject the constitutional challenge to the termination statutes and hold clear, cogent, and convincing evidence supports termination and termination is in the best interests of the children. We affirm the order terminating Franks' parental rights to M.-A.F.-S. and V.F.-C.[21]

WE CONCUR:

---

[21] Given our decision, we deny Franks' motion to stay execution of the termination order under RAP 18.13A(k).